#### [No. 3896.]

IN RE ASSESSMENT OF PROPERTY BY THE STATE BOARD OF EQUALIZATION.

INTERROGATORIES FROM GOVERNOR—PRIVATE RIGHTS.

The Supreme Court will not give its opinion upon *ex parte* interrogatories from the governor in relation to matters involving private rights, or review its previous decision in a litigated cause.

THE answer of the court is in response to interrogatories propounded by the Governor. In the preliminary statement of his communication are the various sections of the constitution and of the revenue act, and the facts bearing upon the questions submitted.

Therein, among other things, is the recital that the county assessors of the state have disregarded the provisions of the statute which require that property shall be assessed for taxation at its full cash value. It appears also, from this statement, that since the year 1892 the aggregate assessed value of all the property in the state, as returned by the county assessors, has been constantly and gradually decreasing, while the aggregate assessed value of railroad property, as fixed by the state board of equalization, has remained at practically the same figure although there has been a slight average increase.

It further appears that on account of the great reduction in valuations as made by the county assessors, the result has been seriously to cripple those state institutions which depend for support and maintenance upon a mill tax.

Upon the facts contained in the preliminary statement, as thus briefly outlined, are submitted the following interrogatories:

"1. Under the sections last cited, would the auditor of state be justified in declining to receipt for an abstract of assessment when he is fully satisfied that the assessment was made on a basis not exceeding fifty per cent of the full cash value of the property, even though the abstract were in the form prescribed?

"2. Under the law and the facts hereinbefore stated, should the state board of equalization assess railroad property at full cash value, or should it be assessed upon a basis equal to the average basis upon which all other property is assessed by the county assessors, or upon some other basis?

"3. Under the law and facts hereinbefore stated, would it be lawful for the state board of equalization to take the basis of some one county, which the board deems the nearest approach to the lawful basis, as the basis of valuation for the state, and adjust the valuations of all other counties to such basis, even though the effect might be to raise or lower the aggregate assessment of the state as made by the county assessors?

"4. Has the state board of equalization authority to adjust and equalize the valuation of the property assessed by the county assessors in such manner as to make it correspondingly equal in value with that assessed by the board of equalization?

"5. Is the statute requiring the board of equalization to assess railroad property in any way obnoxious to that provision of the constitution providing for county assessors?

"6. Is the statute concerning equalization, providing as it does no adequate or practicable method of equalizing the values between the several counties, obnoxious to that provision of the constitution which requires the state board of equalization to adjust and equalize such valuations, or to that provision quoted which requires all valuations to be just and equitable?"

Mr. BYRON L. CARR, attorney general, Mr. CALVIN E. REED, Mr. A. M. STEVENSON, Mr. VICTOR A. ELLIOTT, Mr. L. F. TWITCHELL, Mr. CHARLES G. CLEMENT, Messrs. TELLER, ORAHOOD & MORGAN, Mr. H. W. HOBSON, Mr. E. E. WHITTED, Messrs. WOLCOTT & VAILE, and Mr. H. E. MAY, *amici curiæ.*

PER CURIAM. After mature deliberation, we are constrained to withhold our opinion upon these important questions. In so doing we are observing the general rule (occasionally and in exceptional instances—and perhaps unwisely —departed from), by which this court has governed itself in similar cases. In these *ex parte* proceedings the court has had occasion frequently to declare the dangers of making announcements affecting the rights of private parties, without their presence in court by counsel of their own choice to protect them.

1. The first two interrogatories plainly involve private rights. The first asks for interpretation of a statutory provision directing the board of county commissioners to retain twenty-five per cent of the compensation of a county assessor until he shall have procured from the state auditor a certificate that he has duly delivered to the auditor a copy of the abstract of assessment for his county, and that the same has been made in accordance with the law. If we should answer that the state auditor had the power suggested, we would determine a property right of the assessor without affording him an opportunity to be heard.

2. So, also, with respect to the second interrogatory: The persons or corporations affected by our answer might justly complain that their rights were being determined without their presence in court.

3. Other, but equally persuasive, reasons induce us to withhold an opinion upon the remaining questions. The subject-matter of the third interrogatory was before this court in the case of *People v. Lothrop*, 3 Colo. 428, where, after exhaustive argument on both sides, and upon thorough con-

sideration by the court, it was held, among other things, that under the constitution and laws as they then existed, the state board of equalization had not the power to increase the aggregate assessed valuations as returned by all the county assessors. As to the provisions now under consideration, there has been no material change in our revenue laws since that time, and the doctrine of the case has been directly approved in *State v. Equalization Board*, 18 Mont. 473, and *Gray v. Stiles*, 49 Pac. Rep. (Okla.) 1083. The decision has also been acquiesced in by all of the departments of government and the people generally; and the general assembly has not seen fit to exercise the power, which is claimed to be inherent, of passing a law authorizing the state board of equalization, in the discharge of its important duties, to increase the aggregate assessed valuation, as returned by the county assessors. In view of these considerations, and until the general assembly takes some action that requires it, we do not feel called upon, in this *ex parte* proceeding, to review our previous decision.

4. As we understand the fourth interrogatory, it is, certainly in one aspect, included in the third. If, in equalizing the valuation of property assessed by the county assessors, the state board possesses the power to take as the true valuation the standard which it adopts in making its own assessments, this really would involve one of the questions contained in the third; for if its own standard was higher than the average of that of the assessors, and it brought the latter up to the former, the result would be to increase the aggregate of the valuations as returned by the assessors. The answer to this would, therefore, depend largely, if not entirely, upon the answer to that; and our opinion thereupon should be withheld for the reasons there given.

5. The subject-matter of the fifth interrogatory is before this court in *Ames v. The People*, which was argued orally at the same time at which we were favored by learned counsel with arguments in the pending proceeding. The *Ames* case, however, will not be ready for submission upon printed briefs

until the next term of the court; and so, for this reason, if for no other, we should not anticipate the conclusion which will then be announced in a regularly contested cause.

6. The sixth interrogatory, without specifying the particular section or sections, or designating the supposed defects, assumes that our statute concerning equalization furnishes no adequate or practical method of equalizing values; and for that reason alone, we should not be called upon to give our opinion as to its constitutionality. Besides, it is so interwoven with the other questions that the reasons for declining to announce them apply equally here.

In addition to the foregoing, it may be said that we should not be called upon to construe such important constitutional and statutory provisions, without the fullest argument, and only in a litigated case where both the questions of law and the facts may be fully presented by both sides. In view of something said in oral argument, we may be permitted to add what may not be inappropriate, though not strictly germane to the specific interrogatories.

We are not unmindful of the constantly increasing seriousness of the state's financial condition, and of the desire of the executive officers directly charged with the duty of conducting the various departments and institutions, to secure revenue for their reasonable support. The mill rate which the legislature may authorize to be levied for all state purposes is fixed by the constitution. The valuation of the taxable property, as returned by the county assessors, is gradually decreasing, whereas every intelligent person knows that the actual value is increasing. The expenses of the state government, and of the various state institutions, are growing, and sinking funds for the payment of the interest and principal of our bonded debt must be provided for if we are to maintain our credit; but under present conditions this cannot be done without encroaching upon other fixed mill levies, and still further crippling our state institutions.

Unless the general assembly gives relief (which, unquestionably, either directly or indirectly is within its power), there is nothing less than financial disaster ahead. To keep piling

up debts without any provision for liquidation is unwise policy and it is time to stop. These are not idle words of an alarmist. They are measured and deliberate expressions, warranted by the facts. It is not our province to legislate, but the startling disclosures which the governor's communication contains justify us in saying that one effectual remedy (we do not say there may not be others) the general assembly may furnish. A law, containing suitable provisions for its enforcement, might be passed restricting the boards of county commissioners to a low mill levy in providing for the support of county, municipal and district government for public schools. If the county assessors should still refuse to perform their plain duty, as the communication claims they now do, but persist in violating their oath by assessing property at less than its full cash value, the county commissioners would be obliged to increase their valuations of taxable property in order to meet local expenses; and thus the state would get the benefit of the increased valuation for state purposes.

When the general assembly fails to make provision for meeting the necessary expenses of the state government and the maintenance of the state institutions, and pay the interest and principal of its bonded indebtedness, appeals are addressed to the courts to authorize some extraordinary course, which cannot be sanctioned without a violation by them of the mandatory provisions of the organic law. The limitations of the constitution apply to the judicial as well as to the other departments of government, but apparently this is sometimes overlooked, when the nature of these appeals are considered. The remedy for the evils from which the state suffers lies with the legislature, which, in our judgment, it may give, and still observe all constitutional limitations; but if under the constitution, as it now is, it should be found to be impracticable to raise sufficient revenue to carry out the purposes of an enlightened government, the people, upon proper presentation of the situation, may be relied upon to make all such necessary changes in their constitution, if any are necessary, as will accomplish the desired end. Under no conceivable pressure, must the courts disregard the supreme law of the state.